## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                                    **CASE NO: 5:16-cr-29-Oc-10PRL**

**ANSELMO FELIPE**

---

### REPORT AND RECOMMENDATION[1]

Defendant Anselmo Felipe is charged in a single-count indictment for knowingly and willfully conspiring to possess with intent to distribute more than one hundred marijuana plants. (Doc. 1).  A jury trial is presently set for the March 2017 trial term.  (Doc. 21).

Under the Fourth and Fifth Amendments to the United States Constitution, Defendant seeks to suppress evidence obtained in a search of his home and statements that he made to law enforcement during and after that search.  (Doc. 13).  Specifically, he contends that probable cause did not exist to search his home and that law enforcement coerced him into making involuntary statements.  The Government opposes any suppression of evidence.  (Doc. 17).

On January 24, 2017, I held an evidentiary hearing where the parties offered argument on whether an affidavit submitted by Special Agent Wayne M. Andrews provided probable cause to search Defendant's home and the government presented the testimony of Miami Police Detective Jorge Valdes-Valle and Gainesville Police Task Force Officer James R. Bray.  After reviewing the affidavit, the law, and considering the parties' arguments, I submit that the search of Defendant's

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions.  *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

home was lawful.  And upon a review of the record, including the testimony of Detective Valdes-Valle and Officer Bray, along with an assessment of the content and context of both Defendant's and law enforcement's statements made during the questioning, I submit that Defendant's statements were voluntary.  Thus the motion to suppress should be denied in its entirety.

I.    BACKGROUND

A.  The affidavit

On May 9, 2016, the United States presented Magistrate Judge Andrea M. Simonton with an affidavit signed by Agent Andrews.  That affidavit sought permission to search Defendant's residence, located at 6972 SW 159th Court in Miami, Florida.

The affidavit had two attachments.  The first described the residence and showed pictures of it.  The second listed the items to be seized: documents tending to show the identity of drug traffickers and records of drug transactions; bank and financial records tending to show the concealment of money; documents tending to show the expenditure of narcotic proceeds on personal or real property; any material or devices used in marijuana grow houses (including fertilizer and chillers); marijuana; and computers, pagers, cell phone, and other electronic devices.

The affidavit itself is based on Agent Andrews's sworn testimony, his personal knowledge, and knowledge relayed to Andrews by other officers and a cooperating defendant.  Judge Simonton found that the affidavit established probable cause to search Defendant's residence and granted the United States permission to do so.

*1. Grow house operations and drug traffickers generally*

In his affidavit, Agent Andrews avers that he has spent twenty-four years as an agent with the Drug Enforcement Administration.  (Doc. 13-2 ¶1).  During that time he has received

specialized and continued training in drug law enforcement and has experience in hundreds of investigations of indoor and outdoor marijuana grow operations. (Doc. 13-2 ¶¶1, 2). Based on his experience and training, he asserts that the following are common characteristics of marijuana grow operations and drug traffickers.

As to grow operations, Agent Andrews states that indoor grow houses often smell of raw, flowering marijuana. (Doc. 13-2 ¶4). They require large amounts of artificial light and the electrical ballasts for these lights can be heard from outside the grow houses. Grow houses also require large amounts of water, which is usually supplied by an outdoor pool with active pool pumps that cycle on and off, pumps that can likewise be heard from outside the house. (Doc. 13-2 ¶5). Finally, grow houses require caretakers who regularly care for the plants. (Doc. 13-2 ¶6). When multiple houses are used, such caretakers frequently travel from one grow house to another tending to the plants, making repairs, and then moving on the next grow house. These caretakers usually purchase both irrigation and electrical equipment to help maintain the operation. (Doc. 13-2 ¶6).

As to drug traffickers associated with such grow operations, these individuals often keep marijuana sales proceeds in their homes. (Doc. 13-2 ¶7). Indeed, drug traffickers usually keep significant amounts of money on hand to finance their operations. (Doc. 13-2 ¶24(b)). To further run their illegal business, traffickers often keep records (including books, ledgers, receipts, notes, money orders, cashier's checks, and wire transfers) in readily accessible locals like their residences. (Doc. 13-2 ¶24(d–e)). Naturally, traffickers also keep drugs in their homes. (Doc. 13-2 ¶24(e)). Contact information (addresses and telephone numbers) for their associates are often maintained by traffickers in their books, papers, computers, and other electronic devices and are likewise kept in their homes. (Doc. 13-2 ¶24(f)). These traffickers also use cell phones,

pagers, computers, and other devices to speak with their associates and track the data necessary to run their operations.   (Doc. 13-2 ¶24(h)).  Finally, Agent Andrews avers that the recovery of such evidence as outlined above enhances investigations and that he believed that such valuable evidence existed at Defendant's home.  (Doc. 13-2 ¶¶24, 25).

### 2. The grow house operation at issue here

According to Agent Andrews's affidavit, Defendant and at least five others have grown marijuana in Ocala and Jacksonville Florida since early 2015.  (Doc. 13-2 ¶8).   Through a cooperating defendant (the "CD") and surveillance, Andrews asserts that Defendant traveled to and from his home in Miami and marijuana grow houses in Ocala about once a month from October 2015 through April 2016.  (Doc. 13-2, ¶9).

As to the alleged grow houses, according to the CD, the residence at 5720 NE 5th Place, Ocala (the "5720 Grow House") is a marijuana grow house;[2] and according to government surveillance, the residences at 6111 NW 64th Court, Ocala (the "6111 Grow House") and 4435 NE 38th, Ocala (the "4435 Grow House") are also grow houses.  (Doc. 13-2 ¶9).  Defendant's first known contact with the grow houses occurred in October 2015.  (Doc. 13-2 ¶10).

That October, Agent Andrews identified Defendant (via a driver's license photograph) and his copper 2006 Ford F-150 pickup truck (which was registered to Defendant's home address) at the 5720 Grow House.  One month later, Agent Andrews saw Defendant and Azariel Caceres (another marijuana cultivator) at the 6111 Grow House.  (Doc. 13-2 ¶11).  The two men left that grow house in Caceres's vehicle and arrived at a strip mall where Defendant placed two large tool bags containing electrical tools and air conditioning parts and tools along with a cooler

---

[2] The Government corroborated this evidence by visiting the 5720 Grow House.  (Doc. 13-2 ¶¶14, 15).

from Caceres's vehicle into Defendant's truck.  (Doc. 13-2 ¶11).  As noted *supra*, air conditioners (or chillers) are regularly used in marijuana cultivation.

On December 6, 2015, Defendant left the area around his Miami home and arrived at the 5270 Grow House on that same day.  (Doc. 13-2 ¶13).   On his way to that grow house, a photograph was taken of Defendant's truck at a toll plaza in Leesburg, Florida.  According to Agent Andrews, that photograph shows that on his way North to Ocala Defendant sat in the passenger side of the truck and a chiller sat in the truck's bed.  (Doc. 13-2 ¶13).  Over the next couple of days, agents saw Defendant, Caceres, and another person traveling to and from the grow houses.  Around this time, agents visited the 6111 Grow House and heard the sound of electrical ballast, which are used with the high intensity lighting of marijuana grow houses (Doc. 13-2 ¶14); at the 5720 Grow House agents heard the sounds of both cycling pool pumps and electrical ballasts; and at the 4435 Grow House, agents smelled raw flowering marijuana and heard electrical ballasts (Doc. 13-2 ¶14).

The next month, agents saw Defendant's truck parked at the 5720 Grow House while a two-inch hose drained water to the front of the grow house from the back.  (Doc. 13-2 ¶15).  A pool in the backyard of that grow house contained slimy green water that was being refilled; according to Agent Andrews, "marijuana growers commonly use pools as water reservoirs for use in conjunction with chillers."

In March 2016 agents saw Defendant's vehicle parked outside of the 5720 Grow House. Around that time, the CD spoke with Caceres, who stated that the 5720 Grow House was about to be harvested and that "they" might be able to help the CD with some money.  (Doc. 13-2 ¶16). Also around this time, Defendant and Raul Riveron Benedi (another marijuana cultivator) spent about a week in this grow house and seldom left it.  (Doc. 13-2 ¶16).  On March 10, agents saw

Defendant at the 4435 Grow House, and later that day he handed a known marijuana grower what appeared to be a package of cash at a strip mall in Ocala.  (Doc. 13-2 ¶17).

On April 2, 2016, Defendant's truck was seen traveling North from Defendant's residence and a toll plaza camera shows that his truck was "loaded down with liquid fertilizer and other items."  (Doc. 13-2 ¶18).  Two days later, agents saw Defendant and Benedi taking "grow supplies" into the 6111 Grow House.  (Doc. 13-2 ¶19).  And two days after that, an agent saw Defendant and Benedi place large trash bags in Benedi's vehicle at the 4435 Grow House.  (Doc. 13-2 ¶20).  The two men then drove Benedi's vehicle and threw those trash bags into a dumpster. Agents then emptied and photographed the bags' contents: empty five-gallon liquid fertilizer jugs, wiring, plastic pots, drywall, hose segments, marijuana stalks, marijuana residue, and documents with the addresses of the 5720 and 4435 Grow Houses.  (Doc. 13-2 ¶20).

On April 14, 2016, agents saw Defendant load large boxes wrapped in plastic into his truck's bed at the 5720 Grow House and then saw Defendant placing items into his truck at another location in Ocala.  According to electronic surveillance, Defendant traveled to his home afterwards.  (Doc. 13-2 ¶21).

Two weeks later, Defendant left the area around his home in his truck and met with Benedi at the 5720 Grow House.  (Doc. 13-2 ¶22).  After spending about an hour in that grow house, Defendant went to Lowes, bought a shovel, and then went back inside the grow house. After spending around another hour in the grow house, Defendant left for the day.  (Doc. 13-2 ¶22).  The very next day, Defendant went back to the 5720 Grow House, making three trips from the grow house to Lowes and back within four hours.  (Doc. 13-2 ¶23).  Defendant returned home in his truck later that day.

### B.  The interview

The following was established by the testimony of Detective Valdez-Valle and Officer Bray at the hearing held before me.[3]  I note that Defendant offered no testimony in rebuttal.

On May 10, 2016, federal agents searched Defendant's home.  During a protective sweep, Defendant was hand-cuffed (with his hands behind his back) and placed in a patrol car.  (Tr. 9–10).  After the sweep, agents brought him into his home, moved his handcuffs to the front of his body, and allowed him to sit on his couch with his family.  (Tr. 24, 40).  Then, his handcuffs were removed and Officer Bray and Detective Valdez-Valle sat with him on his back patio (next to his pool, in cushioned, wicker chairs) and interviewed him while the officer and the detective were seated six to eight feet away.  (Tr. 10, 11, 12, 35).  Officer Bray and Detective Valdez-Valle wore casual, non-tactical clothes, their shirts indicated that they were law enforcement officers, and Bray (and perhaps Valdez-Valle too) carried a holstered weapon.  (Tr. 8, 11, 33, 37).

Before questioning Defendant, Detective Valdez-Valle (a native Spanish speaker) read him his *Miranda* rights in Spanish from a pre-printed card.[4]  (Tr. 10, 12, 19–20, 34, 42).  Although Defendant declined to sign a waiver form, he agreed to speak with the agents and stated that he had nothing to hide.  (Tr. 35–36, 43, 46).  Officer Bray then commenced a general financial interview in which Detective Valdez-Valle translated Officer Bray's questions and Defendant's answers.  (Tr. 12, 25).  Defendant answered questions about his ownership of the house and on other non-case-specific matters.  (Tr. 13–14, 46–47).  At some point, Detective Valdez-Valle translated a statement from Bray to Defendant that "the only person that could help himself at

---

[3] The hearing's transcript is located on the docket at Doc. 32 and I will refer to the transcript as "Tr." followed by the appropriate pagination.

[4] Officer Bray apparently left out any mention of Detective Valdez-Valle reading Defendant his *Miranda* rights in Bray's DEA Report.  (Tr. 13).   Still, it is clear from the testimony that the detective did read Defendant his constitutional rights before the interview commenced.  (Tr. 19–22, 35–36).

this point was him."[5]  (Tr. 38, 46).  When asked about the Ocala marijuana grow houses (case-specific questions), Defendant denied any knowledge of or involvement with those houses.[6]  (Tr. 25–26, 47).

Finally, when Defendant was asked about his substantial line of credit with foreign financial institutions and his foreign real estate holdings, Defendant stated that he would not answer those questions without his lawyer—but he was nevertheless still willing to continue speaking with law enforcement: when Detective Valdez-Valle asked him whether he would like to terminate the interview at that time, he said "no."  (Tr. 14–16, 36).  Around this point in the interview, law enforcement stopped questioning Defendant and he began questioning the officers; in other words, there were no significant questions posed to Defendant after he declined to answer the questions about his foreign debt and foreign real estate holdings.  (Tr. 36–37).  Defendant was calm, confident, and composed throughout the interview, which appeared to last around thirty minutes or so.[7]  (Tr. 16, 28, 36–37).  He was arrested about six months later.  (Tr. 17; Doc. 8).

---

[5] Although Officer Bray was unsure of exactly what he told the detective to tell Defendant (Tr. 26–30), Detective Valdez-Valle noted that he translated to Defendant that "the only person that could help himself at this point was him."  In any event, Officer Bray was certain that he never ordered Defendant to cooperate with the authorities.  (Tr. 31, 39).

[6] It appears that law enforcement officers other than Bray posed this question to Defendant.  (Tr. 25).

[7] While Defendant claims in his motion that law enforcement surrounded him during the questioning and made offers and inducements to obtain his testimony (e.g., offering him unmolested free passage for medical treatment and stating that he faced forty years of imprisonment), Officer Bray and Detective Valdez-Valle's credible testimony shows that no such offers or statements were made and that law enforcement did not intimidate or threaten him.  (Tr. 16–17, 26–27, 36–38, 45–46).

## II.   LEGAL STANDARD

### A.  Probable Cause

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.   "A sufficient basis for '[p]robable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (quoting *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005)).   "Fair probability" means that "the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." *Id.* (citing *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988)).   And a connection "between the objects to be seized and the premises to be searched can be established 'from the particular circumstances involved and need not rest on direct observation.'" *Id.* (quoting *United States v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009)).

Thus, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime." *United States v. Bradley*, 644 F.3d 1213, 1263 (11th Cir. 2011) (citing *United States v. Jenkins*, 901 F.2d 1075, 1080–81 (11th Cir. 1990)).   "[A] police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause." *Id.* at 1263–64.   And "[e]vidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at their residence will support a search." *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008).   In other words, "[i]t is not necessary . . . that the residence

be the locus of the crime, or for agents to have procured specific evidence that relevant records would certainly be found there." *Bradley*, 644 F.3d at 1264.

"[T]he preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination."[8]   *United States v. Leon*, 468 U.S. 897, 914 (1984); *United States v. Robinson*, 62 F.3d 1325, 1331 (11th Cir. 1995) ("We accord great deference to judicial determination of probable cause to issue a search warrant.").  Lastly, "[i]n determining probable cause, a court may consider only the information that had been presented to the issuing judge." *United States v. Leach*, 498 F. App'x 915, 917 (11th Cir. 2012) (citing *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982)).

### B.  Statements

Under the Fifth Amendment, "the burden is on the defendant to establish he was in custody and the statements were made in response to government questioning." *United States v. Aldissi*, No. 8:14-CR-217-T-33EAJ, 2015 WL 1268284, at *3 (M.D. Fla. Mar. 19, 2015); *United States v. de la Fuente*, 548 F.2d 528, 533–34 (5th Cir.1977).[9]  Indeed, "[t]he right to *Miranda* warnings [only] attaches when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"   *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

---

[8] In 1990 the title "Magistrate" in the federal system was replaced with the title "Magistrate Judge." *See generally* Ruth Dapper, *A Judge by Any Other Name? Mistitling of the United States Magistrate Judge*, 9 FED. CTS. L. REV. 1 (2015).

[9] All decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981 are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

When a formal arrest has not occurred, courts generally apply a two-part test to determine whether a suspect was restrained to such a degree that he or she was nevertheless in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). This inquiry is objective—whether a suspect is "in custody prior to his formal arrest 'depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *Brown*, 441 F.3d at 1347 (quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)).

Under the totality of the circumstances, courts consider the following factors to determine whether a suspect was in custody: "the location of the questioning; the duration of the questioning; statements made during the interview; presence or absence of physical restraints during the questioning; and release of the interviewee at the end of questioning," along with the officers' language and tone and whether they brandished weapons or touched the suspect. *Aldissi*, 2015 WL 1268284 at *4 (citing *Howes v. Fields*, 132 S.Ct. 1181, 1189–90 (2012)).

Once *Miranda* rights are provided, only a voluntary, knowing, and intelligent waiver of those rights will be effective. *Miranda*, 384 U.S. at 444. When the defendant challenges the voluntariness of his confession, "the government bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary." *United States v. Grimes*, 142 F.3d 1342, 1350 (11th Cir.1998). "The standard for evaluating the voluntariness of a confession is whether a person 'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'" *United States v. Castaneda–Castaneda*, 729 F.2d 1360, 1362 (11th Cir.1984) (quoting *Jurek v.*

*Estelle*, 623 F.2d 929, 937 (5th Cir. 1980) (en banc) *cert. denied,* 450 U.S. 1001 (1981)).

"Voluntariness depends on the totality of the circumstances and must be evaluated on a case-by-case basis." *Id.* Courts consider "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police" to determine whether a suspect's statements were voluntary. *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003).

### III.  DISCUSSION

#### A.  Probable Cause

I submit that the affidavit provided probable cause to search Defendant's residence, because it established a sufficient nexus between the criminal acts at issue and the home.[10]  Indeed, the affidavit shows that Defendant participated in marijuana cultivation; that he traveled to and from his residence and marijuana grow houses in his truck registered to his home; that the evidence Agent Andrews believed would be found in Defendant's home are all items capable of being easily stored in a residence; and that drug traffickers often keep such evidence in their homes.

As to the evidence that Defendant cultivated marijuana, the affidavit shows that Defendant frequented the grow houses monthly during the period at issue, including about a week-long stint in the 5720 Grow House in which he and Benedi "seldom departed" from it.  (Doc. 13-2 ¶¶9, 11, 13, 16, 17, 19, 20, 21, 22, 23).  It appears that Defendant played a consistent role in delivering tools, supplies, and equipment to the grow houses.  For instance, there is evidence in the affidavit

---

[10] To the extent that the affidavit fails to provide any support for the assertion that Defendant visited grow houses in Jacksonville, Florida (see Doc. 13-2 ¶9), this omission is insignificant and immaterial. *United States v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir. 1987) ("Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant.").  Ample evidence exists that Defendant visited the alleged Ocala grow houses.

that Defendant delivered a chiller, liquid fertilizer, and a shovel to the grow houses, along with making numerous trips to hardware stores like Lowes.  (Doc. 13-2 ¶¶13, 18–19, 22).  Defendant also removed various items from grow houses at least twice—one incident involving the removal of large black trash bags that contained marijuana, marijuana stalks, and other paraphernalia.  (Doc. 13-2 ¶¶20, 21).  Further, there is evidence in the affidavit that Defendant made an alleged cash payment to a known marijuana grower.  (Doc. 13-2 ¶17).

Also according to the affidavit, Defendant repeatedly traveled to and from his home (or the area around his home) and the grow houses in his truck, which (again) is registered to his home address.  On December 6, 2015, Defendant left the vicinity of his home with a chiller in the bed of his truck and arrived at the 5270 Grow House that day.  (Doc. 13-2 ¶13).  On April 2, 2016, he left his home and a photograph was taken of his truck as he traveled North towards Ocala—the photograph showed that Defendant's truck carried liquid fertilizer.  (Doc. 13-2 ¶18).  Two days later Defendant was seen carrying "grow supplies" into the 6111 Grow House (Doc. 13-2 ¶19); and two days after that Defendant was seen placing bags into Benedi's vehicle and then dumping those bags into a dumpster—those bags contained wiring, plastic pots, drywall, hose segments, marijuana stalks and residue, documents from the 5720 and 4435 Grow houses, and (notably) empty five-gallon liquid fertilizer jugs.  (Doc. 13-2 ¶20).  On April 14, 2016, Defendant placed "large boxes wrapped in plastic" into his truck from the 5720 Grow House.  (Doc. 13-2 ¶21).  Then, after stopping at another location and placing additional item in his truck, electronic surveillance shows that Defendant went home in his truck afterwards.   On April 28, 2016, surveillance reveals that Defendant left the area of his residence and arrived at the 5720 Grow House and met with Benedi—the same person Defendant moved the trash bags with that contained evidence of marijuana cultivation.  (Doc. 13-2 ¶22).  The next day, Defendant spent around four hours making

at least three trips from Lowes to the 5720 Grow House and back; Defendant was then "observed departing from the Ocala area returning to the Target Residence [i.e. his home]" in his truck.  (Doc. 13-2 ¶23).

Plainly, the evidence in the affidavit provides probable cause to believe that Defendant was a substantial participant in a conspiracy to cultivate marijuana; that Defendant traveled to and from his home (in his F-150 pickup registered to his home address) to cultivate the illegal drug in multiple grow house in Ocala; and that Defendant likely brought evidence of his crime (in his vehicle or otherwise) to and from his home when he traveled from his home to the grow houses and vice versa.

Also, the evidence that Agent Andrews believed would be found in Defendant's home, e.g., drugs, cash, records, electronic devices, etc., are all items capable of being easily stored in a residence.  Lastly, the affidavit clarifies that based on Defendant's alleged drug trafficking behavior (as described in detail in paragraphs eight through twenty-four of the affidavit) and Agent Andrews's prior experience, the agent believed that evidence of drug trafficking would likely be found in Defendant's home (Doc. 13-2 ¶¶24–25)—a belief that Judge Simonton was free to rely upon in finding probable cause to search Defendant's residence.  *See Bradley*, 644 F.3d at 1263–64 ("[A] police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause."); *see also United States v. Meryl*, 322 F. App'x 871, 874 (11th Cir. 2009) (noting the "district court's common-sense finding that 'drug dealers are likely to keep evidence of their drug business at home'").

Accordingly, I submit that the affidavit was sufficient under the law to allow the search of his home.  *See Jenkins*, 901 F.2d at 1081 (noting that when probable cause exists that the defendant

committed the crime in question, the contraband at issue is capable of being stored in a residence, and an experienced agent states that such contraband is likely to be found therein, probable cause exists to search the residence).

### B.  Statements

#### 1.  Defendant was not in custody

While Defendant admits that he was not formally arrested at the time that he made the statements at issue, he does assert that given the context in which he made statements he was nevertheless in custody for purposes of *Miranda*.  I disagree.

As an initial matter, the interview at issue was preceded by a protective sweep (connected with the execution of the aforementioned search warrant) of Defendant's home in which he was handcuffed (behind his back) and placed in a patrol car during that time.  After the sweep, Defendant was moved to his couch and sat with his family as law enforcement continued to search his home (Defendant's handcuffs were placed in front of him at that time).  I note that these circumstances fall short of a formal arrest.  *See, e.g.*, *United States v. Crews*, No. 3:13-CR-230-J-34MCR, 2014 WL 5690448, at *5 (M.D. Fla. Nov. 4, 2014) ("The actions taken by the law enforcement agents-forcibly entering Defendant's residence with weapons drawn, ordering Defendant to lay on the ground, handcuffing Defendant and escorting him outside of the house-were actions taken to ensure law enforcement's safety in connection with the execution of the search warrant and fall short of the degree of restraint associated with formal arrest.").  In any event, by the time the interview occurred, Defendant's handcuffs were removed and it appears that the protective sweep was over.

Thus, moving on to the interview itself, I note that the interview occurred pool-side at Defendant's home as he and the officers sat in cushioned, wickers chairs: "[A]lthough the

location of the interview is surely not dispositive in determining whether the interviewee was in custody, '[c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home." *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) (quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994)) (quotation marks omitted) (emphasis in the original).  Further, there is no evidence that the interview lasted more than an hour (even a four-hour interview may be non-custodial).  *See McDowell*, 250 F.3d at 1362.  He was not handcuffed or restrained by the officers during the interview.  *See United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).  And he had not been threatened with an arrest, the officer's had not drawn their guns, and the officers were using calm and conversational tones.  *See United States v. Luna-Encinas*, 603 F.3d 876, 881–82 (11th Cir. 2010).  Thus, under these circumstances, Defendant was not entitled to receive a *Miranda* warning as he was not in custody at the time of the interview (though the agents gave him a warning anyway).

## 2. *Defendant's statements were made voluntarily*

As stated above, the interview at issue here occurred after Defendant was advised of his *Miranda* rights, which he then orally waived by stating that he was willing to talk with law enforcement and that he had nothing to hide.  Defendant sat on his own back patio and spoke with two agents (one of which translated questions to him in his native language of Spanish).  Defendant was not handcuffed at the time and no officer stood watch over Defendant, drew a weapon, or touched him.  Once law enforcement asked him a question that he did not wish to answer without his attorney present, law enforcement did not press him but instead asked if he wanted to terminate the interview (which he did not).  And there is no evidence that the agents made any promises or threats to induce Defendant's statements: At most, Defendant was

instructed that "the only person that could help himself at this point was him."   Under these circumstances, I submit that the statements Defendant seeks to suppress were voluntary and "were not the product of 'intimidation, coercion, or deception.'"   *United States v. Vanbrackle*, 397 F. App'x 557, 563 (11th Cir. 2010) (quoting *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995)).

## IV.   RECOMMENDATION

Upon due consideration, it is respectfully **RECOMMENDED** that the motion to suppress (Doc. 13) be **DENIED**.

**RECOMMENDED** in Ocala, Florida on January 27, 2017.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Court Security Officers